UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                              Case No. 8:17-cr-585-T-02CPT

JUAN CARLOS RAMIREZ-ARCOS
_____/

**REPORT AND RECOMMENDATION**

Before me on referral is Defendant Juan Carlos Ramirez-Arcos's *Motion to Suppress Defendant's Statements.* (Doc. 32). By way of his motion, Ramirez-Arcos seeks to suppress admissions he made to law enforcement both before and after his arrest on November 9, 2017. *Id.* The government opposes Ramirez-Arcos's motion only in part. While it agrees to the suppression of Ramirez-Arcos's post-arrest admissions, it maintains that his pre-arrest statements were lawfully obtained.[1] *See* (Doc. 40 at 2 & n.1; Doc. 56 at 1, 5; Doc. 63 at 5, 78; Doc. 68 n.1).

An evidentiary hearing was held on the matter (Docs. 62, 63), after which the parties submitted supplemental briefing (Docs. 68, 69). Based on the Court's own research, it requested further briefing (Doc. 71), which the parties have now provided (Docs. 75, 76).

---

[1] Because the government does not oppose the suppression of the post-arrest statements, I do not address that subject further.

Upon a thorough review and consideration of the parties' submissions and the evidence tendered at the hearing, I respectfully recommend that Ramirez-Arcos's suppression motion be granted.

I.

On November 2, 2017, Border Patrol Agent Robert Vadasz, a twenty-plus-year veteran of law enforcement, received a call from Assistant State Attorney Brian Chambers regarding a second-degree murder case Chambers was prosecuting against Ramirez-Arcos in Manatee County, Florida. (Doc. 63 at 38-45, 62). Vadasz, who testified at the hearing, knew Chambers from their work together in the past. *Id.* at 44. As a Border Patrol Agent, Vadasz's responsibilities included determining the alienage of persons and arresting those in the country illegally. *Id.* at 50-51.

During the call, Chambers informed Vadasz that the murder charge against Ramirez-Arcos stemmed from a shooting in Manatee County approximately two years earlier, and that the case was then being tried in state court. *Id.* at 44-45, 62. Because Chambers "was unsure of . . . the direction of the trial," he advised Vadasz that he believed Ramirez-Arcos was illegally in the United States and inquired if there was an immigration detainer on file for Ramirez-Arcos at the Manatee County jail where he was being held. *Id.* at 44. Vadasz ran Ramirez-Arcos's information through law enforcement databases and found "no record of prior immigration documents or authorization [for Ramirez-Arcos] to enter the United States." *Id.* at 46-47; *see also id.* at 49. Vadasz also found no evidence of any encounters between Ramirez-Arcos and Border Patrol. *Id.* at 47-48.

In addition, Vadasz learned from his database search that "an enforcement removal operations detainer" had been lodged against Ramirez-Arcos in 2015 at the Hillsborough County jail where Ramirez-Arcos was incarcerated immediately after his arrest on the murder charge.[2]  *Id*.  Vadasz testified that such a detainer meant that the issuing official had reason to believe that Ramirez-Arcos was in the country illegally.  *Id*. at 47.

As part of his investigation into Ramirez-Arcos's immigration status, Vadasz contacted the Manatee County jail and learned that Ramirez-Arcos had identified his birthplace as Mexico during his initial processing at the facility.  *Id*. at 48-49.  Vadasz further discovered, however, that, "for whatever reason," no detainer had been lodged against Ramirez-Arcos at the Manatee County jail.  *Id*. at 45.

Based on the evidence he had obtained, Vadasz decided he needed to question Ramirez-Arcos directly.  *Id*. at 49-50.  As Vadasz explained at the hearing, by that juncture, "with the information I had already gathered, there was definitely reason to believe that [Ramirez-Arcos] was not legally present in the United States, but that would be determined specifically by questions asked of" him.  *Id*. at 49.

Before Vadasz or any other immigration officials could speak with Ramirez-Arcos, however, he was acquitted on the murder charge and released.  *Id*. at 45-46, 63.

---

[2] According to the parties' submissions, the murder charge stemmed from the shooting of Jose Aguilar in Manatee County on October 17, 2015. (Doc. 56 at 1; Doc. 75 at 1).  Vadasz testified that it was his understanding that Ramirez-Arcos fled to Hillsborough County after the shooting, was apprehended there, and was later transferred to Manatee County for prosecution. (Doc. 63 at 47-48).

According to the parties' submissions and the testimony adduced at the hearing, Ramirez-Arcos's release from custody occurred on either November 2 or 3, 2017. *Id*. at 45-46; (Doc. 56 at 1-2; Doc. 75 at 1).

In order to locate Ramirez-Arcos, Vadasz obtained a list of his prior known addresses from the State Attorney's Office and the Manatee County jail. *Id*. at 52. Vadasz then enlisted the help of his partner, Javier Lopez, as well as three deputies from the Manatee County Sheriff's Office (MCSO) to canvas these addresses. *Id*. at 51-52, 63. One of these deputies was Joel Rodriguez, who also testified at the hearing. *Id*. at 9-11.

During the early morning hours on November 9, 2017, Vadasz and Lopez met with Rodriguez and the two other MCSO deputies at a restaurant parking lot in West Bradenton near the first address on their list. *Id*. at 11-12, 52. All of the officers were armed and in full uniform. *Id*. at 18-21, 24, 60-61, 68. During the meeting, Vadasz provided the deputies with a photo of Ramirez-Arcos, along with his name and date of birth. *Id*. at 12. Although they did not have a warrant for Ramirez-Arcos's arrest, it was Rodriguez's understanding that Vadasz and Lopez were looking to take Ramirez-Arcos into custody that day. *Id*. at 21-22.

The officers then went to the first location where they encountered Ramirez-Arcos's ex-girlfriend and her current boyfriend. *Id*. at 12, 52. Vadasz and Lopez interviewed the ex-girlfriend, who advised she was no longer in a relationship with Ramirez-Arcos because he had "violent tendencies," which included "previously h[olding] a gun to her head." *Id*. at 53-54. In response to Vadasz and Lopez's inquiries

4

regarding Ramirez-Arcos's whereabouts, the ex-girlfriend stated it "would make sense" that he would be living with his father, as he had done prior to his arrest. *Id*. at 54, 66. She advised that the father's residence was located at 301 22nd Street East in Bradenton. *Id*. at 54.

While Vadasz and Lopez finished interviewing the ex-girlfriend, Rodriguez and the two other MCSO deputies travelled to the 301 22nd Street address, where they encountered, among others, a man standing next to a work truck in the driveway. *Id*. at 13-14, 23. Rodriguez spoke to the man, who advised that he lived with Ramirez-Arcos at the residence and that Ramirez-Arcos was inside. *Id*. at 14-15, 27-28.

With the man's permission, *id*. at 15, 28-30, 56, Rodriguez and another deputy then entered the home through the front door accompanied by the man, while the third deputy went to the rear of the residence "[j]ust in case [Ramirez-Arcos] decided to flee the house," *id*. at 15; *see also id*. at 24, 27, 31. Inside, they found a very small living room (roughly ten by fifteen feet) with a couch along the wall where a shirtless male in his underwear—later identified as Ramirez-Arcos—was sleeping. *Id*. at 15-16, 23, 31-33, 35, 69, 80-81. After waking Ramirez-Arcos and removing his blanket to make sure he was unarmed, *id*. at 32-33, Rodriguez informed Ramirez-Arcos that another agency needed to speak with him and that "[w]e just needed to stand by," *id*. at 16, *see also id*. at 33-34. Rodriguez testified that the officers did not draw weapons during this encounter, but he could not recall whether they handcuffed Ramirez-Arcos. *Id*. at 16-17, 33. Rodriguez also testified that Ramirez-Arcos was calm throughout their time together, and that neither Ramirez-Arcos nor anyone else revoked consent for law

5

enforcement to be in the house. *Id*. at 16. At some point shortly thereafter, an elderly male who had been sleeping in a side bedroom came into the living room and joined Rodriguez, the other deputy, Ramirez-Arcos, and the man from the work truck. *Id*. at 17-18.

Vadasz and Lopez arrived at the residence within "minutes" of Rodriguez and the other two deputies. *Id*. at 17. They found the front door open and Ramirez-Arcos sitting on a chair inside the doorway. *Id*. at 56-57, 69-70, 79-80. Vadasz testified that Ramirez-Arcos was not handcuffed and that at least two deputies stood at or near the door at the time. *Id*. at 56-57, 80-82.

While Lopez remained just outside the doorway, Vadasz, who is fluent in Spanish, went directly to Ramirez-Arcos and asked him in Spanish what his name was. *Id*. at 36, 56-58, 68, 71. Ramirez-Arcos—who did not testify at the hearing—responded "Juan Ramirez Arcos." *Id*. at 58; *see also id*. at 71-72. Vadasz then identified himself and asked Ramirez-Arcos "the basic immigration questioning"—specifically, his "identity" and "citizenship" and how he "derives [his] legal right to be in the United States." *Id*. at 42, 58. As Vadasz elaborated at the hearing:

> I identified myself as a Border Patrol Agent. I asked him [of] what country he was a citizen. He stated Mexico. I asked him if he had immigration documents that would allow him to be here legally. He said no. I asked him if he had ever applied for permission to be here. He said no. I asked him when he entered the United States. He said he didn't remember when, but like 2001. Somewhere around that. Okay, I said, illegally? He said, illegally.

*Id*. at 58; *see also id*. at 72-74.

6

According to Vadasz, Ramirez-Arcos was calm during this exchange and did not appear to have any difficulty understanding Vadasz. *Id*. at 59. Vadasz also testified that no weapons were drawn, and no threats were made. *Id*. at 57.

Based on Ramirez-Arcos's admissions, Vadasz placed him in handcuffs and took him into custody. *Id*. at 58-59, 76. Vadasz estimated that no more than "a minute" elapsed "[f]rom the time [he] entered the doorway [of the residence] until the time [Ramirez-Arcos] was in handcuffs . . . [I]t was a very short period of time." *Id*. at 59; *see also id*. at 76.

Vadasz thereafter transported Ramirez-Arcos to Border Patrol's Tampa sub-office to be processed. *Id*. at 75-77. Once that processing was complete, Vadasz advised Ramirez-Arcos of his *Miranda* rights, and Ramirez-Arcos invoked his right to counsel. *Id*.

II.

A.

In support of his motion to suppress his pre-arrest statements, Ramirez-Arcos argues that those admissions were made during custodial interrogation prior to the issuance of any *Miranda* warnings. (Doc. 69 at 5-17; Doc. 75 at 2-5). In response, while conceding that Ramirez-Arcos was detained "briefly" and "temporarily seized" in "his house" (Doc. 68 at 6-7; Doc. 76 at 1), the government maintains that this detention constituted a valid investigative stop pursuant to *Terry v. Ohio*, 392 U.S. 1

(1968),³ and that Ramirez-Arcos was not in custody for purposes of *Miranda* until after the investigative stop had concluded (Doc. 68 at 6-10; Doc. 76 at 1, 3-5).

Upon due consideration of the matter, I find that the government's argument is foreclosed by the Eleventh Circuit's decision in *Moore v. Pederson*, 806 F.3d 1036 (11th Cir. 2015). In *Moore*, a Seminole County Sheriff's Deputy, Pederson, went to an apartment complex following a report that a man and two women were outside yelling at each other. *Id*. at 1040. At the complex, Pederson was directed to the apartment where the man and one of the women had retreated. *Id*. After hearing what sounded like an argument coming from inside the apartment, Pederson knocked on the door and was greeted by Moore, who was wearing only a towel. Pederson could see two women behind Moore, one of whom was naked and one of whom "appeared visibly upset." *Id*.

Not knowing whether he was faced with a "domestic violence situation," Pederson began interviewing Moore about his involvement in the earlier disturbance outside and requested multiple times that Moore provide his name and identification. *Id*. Moore declined to do so. *Id*.

Pederson ultimately took out his handcuffs and instructed Moore to turn around and put his hands behind his back. *Id*. When Moore complied, Pederson reached across the threshold of the door, handcuffed Moore while Moore was still

---

³ In *Terry*, the Supreme Court held that a law enforcement officer may conduct a "brief, investigatory stop" of an individual without violating the Fourth Amendment "when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30).

standing inside his home and arrested him. *Id*. Moore was subsequently charged with resisting an officer without violence based on his refusal to provide his biographical information. *Id*. at 1041.

Following this incident, Moore sued Pederson in federal court alleging, among other claims, false arrest in violation of 42 U.S.C. § 1983. *Moore v. Seminole Cty, Fla.*, 2014 WL 4278744, at *2 (M.D. Fla. Aug. 29. 2014). Pederson thereafter moved for summary judgment on the section 1983 claim, arguing that Moore's arrest was lawful because he had failed to provide his identification during a valid *Terry* stop and that, even if probable cause was absent, Pederson was entitled to qualified immunity, *id*. at *4-5.

In resolving Pederson's summary judgment motion, the district court rejected Pederson's contention that his encounter with Moore constituted a valid *Terry* stop. *Id*. at *5. Noting "the 'respect traditionally accorded to the sanctity of the home,'" the court observed that "circumstances that would justify an investigatory detention of an individual on a public street will not justify such a detention within that individual's residence." *Id*. (quoting *Payton v. New* York, 445 U.S. 573, 601 (1980)). "Simply stated," the court emphasized, "'*Terry* does not apply *inside* a home.'" *Id*. (quoting *United States v. Crapser*, 472 F.3d 1141, 1149 (9th Cir. 2007) (emphasis in original)).

The court found, however, no precedent from the United States Supreme Court, the Eleventh Circuit, or the Florida Supreme Court "that would inform a reasonable officer that the *Terry* stop that occurred in this case violated clearly

9

established law." *Id.* As a result, it concluded that Pederson was entitled to qualified immunity. *Id.*

On appeal, the Eleventh Circuit affirmed the district court's ruling. *Moore*, 806 F.3d 1036. In doing so, the appellate court similarly rejected Pederson's contention that he had conducted a valid *Terry* stop, holding "that, in the absence of exigent circumstances, the government may not conduct the equivalent of a *Terry* stop inside a person's home." *Id.* at 1039 (footnote omitted); *see also id.* at 1054 ("Home may be where the heart is, but it cannot be where the government is—at least for purposes of conducting a *Terry*-like stop, in the absence of exigent circumstances. Today we clearly establish this as the law in this Circuit."); *id.* at 1055 (Proctor, J., sitting by designation, concurring) ("agree[ing] that Pederson could not have lawfully executed a *Terry* stop in this case, at least while Moore was inside his home").[4]

---

[4] The Eleventh Circuit's holding in *Moore* is in accordance with the rulings of a number of other courts that have addressed the propriety of *Terry* stops in the home. *See, e.g., United States v. Perea-Rey*, 680 F.3d 1179, 1188 (9th Cir. 2012) ( "We have held . . . that 'the *Terry* exception to the warrant requirement does not apply to in-home searches and seizures'") (quoting *United States v. Struckman*, 603 F.3d 731, 738 (9th Cir. 2010)); *United States v. Myers*, 308 F.3d 251, 258 (3d Cir. 2002) ("*Terry* has never been applied inside a home."); *United States v. Saari*, 272 F.3d 804, 809 (6th Cir. 2001) (observing that, absent exigent circumstances, warrantless seizures of persons in their homes violate the Fourth Amendment, regardless of whether the officers at issue were conducting an arrest or an investigatory detention); *Wilson v. Jara*, 866 F. Supp. 2d 1270, 1290 (D.N.M. 2011) ("The Tenth Circuit has repeatedly held that, absent exigent circumstances, official acting under the color of authority and without a warrant may not seize a person inside their home, or effect a seizure by ordering a person inside a home to come to the door.") (citations omitted); *Engel v. State*, 391 So. 2d 245, 247 (Fla. Dist. Ct. App. 1980) (holding that neither *Terry* nor Fla. Stat. § 901.151, which authorizes temporary detentions by police officers to determine identity, applies inside a person's residence).

Although it found the *Terry* stop unlawful, the Eleventh Circuit agreed with the district court that, because the law governing this area was not clearly established, Pederson was entitled to qualified immunity. *Id*. at 1048 ("[W]e cannot conclude that [at the time of Moore's arrest] the law was clearly established in this Circuit that a *Terry*-like stop cannot be conducted in the home, in the absence of exigent circumstances. As a result, the district court correctly found that Pederson was protected by qualified immunity with respect to the initial *Terry*-like stop.").

The government argues that *Moore* is inapplicable here because the record establishes that law enforcement had "reasonable suspicion to temporarily seize Ramirez-Arcos, there was consent to enter the home," and there was probable cause to support his arrest. (Doc. 76 at 1). The government's efforts to overcome *Moore* are unavailing.

Contrary to the government's contention, regardless of whether law enforcement had reasonable suspicion to believe that Ramirez-Arcos was not lawfully in the country, it could not—under *Moore*—conduct a *Terry* stop in his home absent exigent circumstances. *Moore*, 806 F.3d at 1039, 1054; *O'Kelley v. Craig*, 2018 WL 4636638, at *7 (N.D. Ga. Sept. 27, 2018) ("*Moore* clearly establishes that 'an officer may not conduct a *Terry*-like stop in the home in the absence of exigent circumstances'") (quoting *Moore*, 806 F.3d at 1047). Indeed, the Eleventh Circuit in

---

The Eleventh Circuit's ruling in *Moore* is also consistent with the view expressed by then-Circuit Judge Sonia Sotomayor in her dissent in *United States v. Gori*, 230 F.3d 44, 62-63 (2d Cir. 2000) that *Terry* stops are not permitted in the home.

*Moore* assumed for purposes of its analysis that Pederson had "reasonable, articulable suspicion of a breach of peace" when he initially approached Moore's door. *Moore*, 806 F.3d at 1044. The court nonetheless found Pederson's purported *Terry* stop unlawful because Moore was in his home at the time of the stop and there were no exigent circumstances that allowed law enforcement to enter his residence without a warrant. *Id*. at 1045.

Notably, the government does not contend its "temporary seizure" of Ramirez-Arcos occurred outside his residence or that exigent circumstances existed. Nor could it. According to the evidence adduced at the hearing, Ramirez-Arcos was inside his home for the duration of the encounter with the officers and, in fact, did not leave his residence until law enforcement escorted him outside following his arrest. In addition, there was no evidence introduced at the hearing that Ramirez-Arcos's apprehension rose to the level of "an 'emergency situation[ ] involving endangerment to life.'" *Moore*, 806 F.3d at 1045 (quoting *United States v. Holloway*, 290 F.3d 1331, 1337 (11th Cir. 2002)) (alternation in *Moore*). To the contrary, Vadasz testified that he and his fellow law enforcement officials did not set out to question Ramirez-Arcos until nearly a week after his acquittal and release from the Manatee County jail. *Cf. United States v. Valerio*, 718 F.3d 1321, 1324 (11th Cir. 2013) (noting that *Terry* exception to warrant requirement "is justified by the exigencies associated with law enforcement 'dealing with . . . rapidly unfolding and often dangerous situations on city streets,'" and that "*Terry* stops are thus limited to situations where officers are required to take 'swift

action predicated upon the on-the-spot observations of the officer on the beat'") (quoting *Terry*, 392 U.S. at 10, 20).

The government's argument that law enforcement's in-home seizure of Ramirez-Arcos was permissible because they had consent to enter his residence is misplaced. As the court made clear in *Moore*, the only exception to the prohibition on *Terry* stops in the home is when exigent circumstances are present.[5]  *Moore*, 806 F.3d at 1039, 1054. Accordingly, whether law enforcement had consent to enter Ramirez-Arcos's home for purposes of conducting a *Terry* stop is immaterial.[6]

B.

The illegality of the investigative stop of Ramirez-Arcos requires suppression of his pre-arrest statements under the circumstances present here. "Ordinarily, evidence secured by the exploitation of the illegality of a search or seizure is 'the tainted fruit of the poisonous tree' and is not admissible at trial." *United States v. Waksal*, 709 F.2d 653, 662 (11th Cir. 1983) (citing *Wong Sun v. United States*, 371 U.S.

---

[5] In this respect, the court drew a distinction between *Terry* stops and warrantless arrests conducted in the home. Unlike the former, the court observed that in-home warrantless arrests are permitted when "'the arresting officer ha[s] probable cause to make the arrest *and* either consent to enter or exigent circumstances demanding that the officer enter the home without a warrant.'" *Id*. at 1043 (emphasis in original) (quoting *Bashir v. Rockdale Cty., Ga.*, 445 F.3d 1323, 1328 (11th Cir. 2006)).

[6] I note in this regard that the Eleventh Circuit in *Moore* characterized the nature of the required consent as "consent to enter the home *for the purpose of effecting an arrest*." *Id*. at 1049 (emphasis added); *see also id*. at 1050 ("nothing in the record provides evidence that Moore ever said or otherwise communicated that he did not consent to entry *for the purposes of executing the arrest*") (emphasis added); *id*. at 1052 ("Today we clearly establish as the law of this Circuit that merely following an officer's commands . . . does not constitute 'surrender' and therefore consent to an officer's entry into the home *to effect the arrest*.") (emphasis added). The government has not argued, much less shown, that law enforcement obtained such consent here.

13

471 (1963) and *Dunaway v. New York*, 442 U.S. 200 (1979)); *see also United States v. Davis*, 313 F.3d 1300, 1302 (11th Cir. 2002) ("Evidence seized after an illegal seizure should be suppressed as the 'fruit of the poisonous tree.'") (citation omitted). This exclusionary rule extends to any fruits of a Fourth Amendment violation, including "confessions or statements of the accused obtained during an illegal arrest and detention." *United States v. Crews*, 445 U.S. 463, 470 (1980) (citing *Dunaway*, *supra* and *Brown v. Illinois*, 422 U.S. 590 (1975)); *see also United States v. Perkins,* 348 F.3d 965, 971 (11th Cir. 2003) (affirming exclusion of statements and evidence seized during unlawful investigative stop).

"In determining whether evidence is 'fruit of the poisonous tree' and, therefore, must be excluded, the relevant question is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Davis*, 313 F.3d at 1302-03 (quoting *Wong Sun*, 371 U.S. at 488). The Supreme Court has identified several factors relevant to this inquiry: "[t]he temporal proximity of the [stop] and the [challenged statements], the presence of intervening circumstances, and . . . the purpose and flagrancy of the official misconduct." *Brown*, 422 U.S. at 603-04. The Court has also identified "[t]he voluntariness of the statement[s a]s a threshold requirement." *Id.*; *see also Valerio*, 718 F.3d at 1325 n.6 ("Evidence obtained as a result of an illegal seizure is suppressible as fruit of the poisonous tree," except where the government "show[s] that the evidence was obtained through voluntary consent and that taint of the Fourth Amendment

14

violation has been sufficiently purged.") (citations omitted)).  In the end, "the burden of showing admissibility [of the challenged statements] rests . . . on the prosecution." *Brown*, 422 U.S. at 604.

The government here fails to argue, much less demonstrate, that Ramirez-Arcos's statements were not derived from the exploitation of the unlawful *Terry* stop and instead were obtained by means sufficiently distinguishable to be purged of that primary taint.  Nor could it.  Ramirez-Arcos's statements were made during the course of his illicit detention, and there were no intervening circumstances that purged the taint of that unlawful restraint.  *See id*. at 604 (finding defendant's confession was obtained by exploitation of his illegal arrest, in part, because defendant's confession was separated from the unlawful arrest "by less than two hours, and there was no intervening event of significance whatsoever").  Moreover, the impropriety of in-home *Terry* stops had been clearly established more than two years prior to the investigatory detention of Ramirez-Arcos.  *See id*. at 605 (noting that "the impropriety of the [challenged] arrest was obvious" in addressing the factor pertaining to "the purpose and flagrancy of the official misconduct").[7]

---

[7] In light of my finding that the taint of the unlawful *Terry* stop was not sufficiently purged by the time Ramirez-Arcos made the challenged statements, I need not address the issue of whether those statements were voluntary.

## III.

For the reasons set forth above, I recommend that the Court grant Ramirez-Arcos's motion to suppress (Doc. 32).

Respectfully submitted this 27th day of February 2019.

*[signature: Christopher P. Tuite]*

HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

## **NOTICE TO PARTIES**

A party has fourteen (14) days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding(s) or legal conclusion(s) the District Judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).

Copies furnished to:
Honorable William F. Jung, United States District Judge
Counsel of record