UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

v.                                                        Case No. 8:17-cr-585-T-02CPT

JUAN CARLOS RAMIREZ-ARCOS,

    Defendant.
_____/

## ORDER

This matter comes to the Court on Defendant Ramirez-Arcos's motion to suppress statements, Dkt. 32, which was referred to the assigned Magistrate Judge. The Magistrate Judge's report recommends granting the motion. Dkt. 83. The United States of America filed a timely objection. Dkt. 85. The Court GRANTS the motion to suppress the statements made during booking and DENIES the motion to suppress the statements made at the residence.

## BACKGROUND

Following an evidentiary hearing, Dkt. 63, the Magistrate Judge laid out in detail the events giving rise to the challenged evidence. Dkt. 83 at 2-7. Neither party has objected to the report and recommendation's factual findings. Dkt. 85 at 2.

In short, Border Patrol Agent Robert Vadasz received a call from a state prosecutor concerning Defendant who was on trial for murder. Dkt. 63 at 44-45. The prosecutor

1

believed Defendant was in the United States illegally and asked Vadasz whether there was an immigration detainer for Defendant at the Manatee County jail. *Id.* at 44. Vadasz discovered that Defendant identified his birthplace as Mexico at the Manatee County jail, though no detainer had been lodged against him. *Id.* at 45, 48-49. Vadasz did find an enforcement removal operations detainer from 2015 at the Hillsborough County jail which, according to Vadasz, meant the issuing official has reason to believe Defendant was in the country illegally. *Id.* at 47-48. Vadasz also found no record of prior immigration documents or authorization for Defendant to enter the United States. *Id.* at 46-47.

Before Vadasz could question Defendant on his immigration status, Defendant was acquitted of the murder charge and released. *Id.* at 45-46. With the help of his partner and three deputies from the Manatee County Sheriff's Office, Vadasz decided to canvas Defendant's prior known addresses. *Id.* at 51-52. Dressed in their uniforms, the Border Patrol agents and the deputies first went to Defendant's ex-girlfriend's residence. *Id.* at 12, 18, 24, 52. Defendant was not there, but the ex-girlfriend suggested he might be at his father's house and provided the address. *Id.* at 54, 66.

While Vadasz and his partner continued to interview Defendant's ex-girlfriend, the deputies went to the address. *Id.* at 13-14, 23. Once there, the deputies found a man standing next to a truck in the driveway who said he lived with Defendant at the residence and that Defendant was inside. *Id.* at 13-15, 23, 27-28. "With the man's

permission" and "consent," the man accompanied two of the deputies through the front door of the residence while the third went behind the residence in case Defendant decided to flee. *Id.* at 15, 27-31, 56; Dkt. 83 at 5.

Defendant, shirtless and wearing only underwear, was sleeping on a couch inside the living room of approximately ten by fifteen feet. Dkt. 63 at 15-16, 23, 31-33, 35, 69, 80-81. The deputies woke Defendant and removed a blanket from his body to ensure he was unarmed. *Id.* at 32-33. The deputies told Defendant he "needed to stand by" as another agency needed to speak with him. *Id.* at 16, 33-34. No guns were drawn, but one of the deputies could not recall whether he had handcuffed Defendant. *Id.* at 16-17, 33. At some point, an elderly man came into the living room and joined the deputies, Defendant, and the man from the work truck. *Id.* at 17-18.

Vadasz and his partner arrived within minutes, and according to Vadasz, within one minute. *Id.* at 17, 56. They found the front door open and Defendant, without handcuffs, sitting on a chair inside the doorway. *Id.* at 56-57, 69-70, 79-80. The partner remained outside the doorway as Vadasz, fluent in Spanish, spoke to Defendant:

> I identified myself as a Border Patrol Agent. I asked him [of] what country he was a citizen. He stated Mexico. I asked him if he had immigration documents that would allow him to be here legally. He said no. I asked him if he had ever applied for permission to be here. He said no. I asked him when he entered the United States. He said he didn't remember when, but like 2001. Somewhere around that. Okay, I said, illegally? He said, illegally.

3

*Id.* at 58; *see also id.* at 36, 56-58, 68, 71-74. Vadasz estimated the exchange took less than a minute. *Id.* at 59, 76. He then placed Defendant in handcuffs and transported him to Border Patrol's Tampa office for processing. *Id.* at 75-77. After processing, Vadasz advised Defendant of his *Miranda* rights. *Id.*

Defendant moved to suppress all statements made by Defendant to Vadasz. Dkt. 32 at 8-9. The Government does not oppose the suppression of the statements made during booking, Dkt. 56, which are thus excluded from trial. The statements Defendant made in the residence are not.

## DISCUSSION

When ruling on a magistrate judge's report and recommendation, the Court may "accept, reject or modify in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b)(3). If objections are filed, as here, a de novo determination is required "of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b)(3).

I. <u>The Government's Entry and Investigatory Detention</u>

The Government first argues the deputies obtained consent to enter the residence from the man next to the truck and that at no point was consent revoked. Indeed, the Magistrate Judge's report did find the deputies had the man's permission to enter. The report reasoned, however, that *Moore v. Pederson*, 806 F.3d 1036, 1039 (11th Cir. 2015),

4

a 42 U.S.C. § 1983 case, nonetheless proscribed an investigate detention akin to a *Terry* stop in a residence without exigent circumstances. Dkt. 83 at 13.

Generally, the Fourth Amendment allows a "brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow,* 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio,* 392 U.S. 1, 30 (1968)). "Reasonable suspicion," which is required to support such a *Terry* stop, is a "significantly more lenient [standard] than that of 'probable cause.'" *Moore,* 806 F.3d at 1044. Though the court in *Moore* stated more than once that *Terry*-like stops are not allowed in the home in the absence of exigent circumstances, *see id.* at 1039, 1054, the court did not foreclose the possibility of a consensual entry. *Moore* was not a consent case. As the court explained:

> We have said that an officer may not enter the home for the purpose of effecting a warrantless arrest unless that officer has both probable cause and either exigent circumstances or consent. So we cannot see how law enforcement could enter a home to detain a person on reasonable, articulable suspicion of a criminal violation (resisting an officer without violence)—a much lower standard than probable cause—when neither exigent circumstances *nor consent* exist.

*Id.* at 1046 (citations omitted) (emphasis added).

Indeed, police can conduct a search in a house with consent, *Illinois v. Rodriguez,* 497 U.S. 177 (1990), and, if supported with probable cause, enter to arrest, *Bashir v. Rockdale Cty., Ga.,* 445 F.3d 1323, 1328 (11th Cir. 2006). The Eleventh Circuit in *Moore* did not carve out *Terry*-like stops from the consent exception. Nor have other circuits.

5

*See, e.g., United States v. Murray*, 821 F.3d 386, 393-94 (3d Cir. 2016) (*Terry* seizure – motel room with consent); *United States v. Lewis*, 608 F.3d 996, 999 (7th Cir. 2010) (limited *Terry* detention – consent in home); *United States v. Romain*, 393 F.3d 63, 70 (1st Cir. 2004) (same – consent in home); *United States v. Flippin*, 924 F.2d 163, 166 (9th Cir. 1991) (same – consent in motel); *see also Delhall v. State*, 95 So. 3d 134, 152-53 (Fla. 2012) (same – consent in home).

To be sure, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," *United States v. U.S. Dist. Ct. for E.D. Mich., S. Div.*, 407 U.S. 297, 313 (1972), and the Fourth Amendment "draw[s] a firm line at the entrance to the house," *Payton v. New York*, 445 U.S. 573, 590 (1980). But, as in other search and seizure contexts, consent makes way for conduct that is otherwise prohibited. In the absence of any express challenge to the consent,[1] the Court finds the entry—and the ensuing very brief investigative detention—constitutional.

Assuming that Defendant was detained, or in other words, a reasonable person would believe he was not free to leave, *United States v. De La Rosa*, 922 F.2d 675, 678 (11th Cir. 1991) (citations omitted), the next question is whether that detention was

---

[1] At oral argument, defense counsel argued the scope of consent might have been exceeded when the third deputy proceeded to the rear of the residence and, later, when Vadasz entered the open front door. But the resident who gave consent did not revoke the consent when this happened, and, in any event, Defendant provides no authority for the proposition that this necessarily vitiates the consent to enter the residence. As for the man's apparent authority to provide consent, he told deputies that he lived in the residence. Dkt. 63 at 14; *see also Rodriguez*, 497 U.S. at 179. There was no reason for the deputies to doubt this, and at no time did Defendant protest. *See Georgia v. Randolph*, 547 U.S. 103, 106 (2006). Nor has contrary evidence been adduced.

lawful. Though the Court ultimately does agree the detention was lawful, the matter is not as simple as the government suggests. Dkt. 85 at 3.

Before the deputies entered Defendant's residence, Vadasz had told them that they needed to locate Defendant to "take [him] into custody." Dkt. 63 at 11. The deputies did not know the details of the case. *Id.* at 12. But courts have found that officers may detain individuals at the request of another officer, even without knowledge of the underlying basis for detention, so long as the requesting officer had reasonable suspicion and the stop is not "significantly more intrusive than would have been permitted the issuing department." *United States v. Hensley*, 469 U.S. 221, 232-33 (1985); *see also United States v. Rodriguez*, 831 F.2d 162, 166 (7th Cir. 1987); *United States v. Cutchin*, 956 F.2d 1216, 1217-18 (D.C. Cir. 1992); *United States v. Ukoha*, 7 F. Supp. 2d 913, 917 (E.D. Mich. 1998).

At the time Vadasz requested assistance from the deputies, he knew that Defendant identified his birthplace as Mexico at the Manatee County jail and there was an enforcement removal operations detainer from 2015 at the Hillsborough County jail. Additionally, Vadasz could find no record of prior immigration documents or authorization for Defendant to enter the United States. Also the state prosecutor trying Defendant for homicide alerted Vadasz that Defendant may be present illegally. The wrinkle here is that, absent direction from federal immigration authorities, the detaining deputies could not detain Defendant for his unlawful presence in the United States.

Indeed, courts have found that even an admission of unlawful presence, without more, does not provide reasonable suspicion of *criminal* activity to justify a *Terry* stop, *see, e.g., Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451, 466 (4th Cir. 2013) (rejecting contention that evidence of unlawful presence constitutes reasonable suspicion to detain an individual pending transport to Immigration and Customs Enforcement); *Melendres v. Arpaio*, 695 F.3d 990, 1001 (9th Cir. 2012) ("[B]ecause mere unauthorized presence is not a criminal matter, suspicion of unauthorized presence alone does not give rise to an inference that criminal activity is 'afoot.'"); *see also Arizona v. United States*, 567 U.S. 387, 407 (2012). But the Government's saving grace is that those cases concerned detentions performed by local authorities in the absence of federal direction.

Here, it does not matter that unlawful presence is not necessarily criminal because Border Patrol agents derive their power to detain for suspected civil immigration offenses through 8 U.S.C. § 1357. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 553 n.8 (1976) (noting statutory authority of Border Patrol agents); *see also United States v. Perkins*, 166 F. Supp. 2d 1116, 1125 (W.D. Tex.), *on reconsideration*, 177 F. Supp. 2d 570 (W.D. Tex. 2001), *aff'd*, 352 F.3d 198 (5th Cir. 2003). The statute provides that agents like Vadasz "shall have power without warrant . . . to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1). Other courts have allowed such interrogations to be "forcible" so long as they comport with "the standards developed in *Terry*." *See Cheung Tin Wong v.*

*U.S. Immigration & Naturalization Serv.*, 468 F.2d 1123, 1127 (D.C. Cir. 1972) (citing cases); *see also United States v. Portillo-Aguirre*, 131 F. Supp. 2d 874, 879 (W.D. Tex. 2001), *rev'd on other grounds*, 311 F.3d 647 (5th Cir. 2002) ("Accordingly, the authority of the Border Patrol is defined not only by the Constitution and Fourth Amendment caselaw, but by the statutes which enumerate its power."); *see also Babula v. Immigration & Naturalization Serv.*, 665 F.2d 293, 295 (3d Cir. 1981); *United States v. Tehrani*, 826 F. Supp. 789, 798 (D. Vt. 1993), *aff'd*, 49 F.3d 54 (2d Cir. 1995) (applying Fourth Amendment analysis because § 1357(a)(1) "authorizes questioning to the full extent permissible under the Fourth Amendment").[2]

As discussed, the Government had reasonable suspicion of, if nothing else, a civil immigration offense. The Court's analysis is unchanged by the fact it was local law enforcement—not Vadasz—who first arrived at the residence.[3] The deputies did so at Vadasz's direction, which courts have found to be significant in the seizure context. *E.g.*, *Santos*, 725 F.3d at 464, 466-67 (noting local law enforcement's ability, outlined by statute, to assist with federal immigration enforcement); *United States v. Soriano-Jarquin*, 492 F.3d 495, 497 (4th Cir. 2007) (detention and transportation lawful where

---

[2] Whether the encounter between law enforcement and Defendant is characterized as an investigative stop under *Terry* or an interrogation pursuant to 8 U.S.C. § 1357(a)(1) does not change the lawful and consensual entry into the residence.

[3] That Vadasz also asked Defendant a question about his entry into the United States, which, if unlawful, can be a criminal offense, does not make the encounter unconstitutional. Though immigration officers have limited ability to probe into criminal matters, *see Perkins*, 166 F. Supp. 2d at 1125, the question was related to Defendant's right to be in or remain in the United States.

directed by federal authorities). In the absence of any challenge to Vadasz's authority under 8 U.S.C. § 1357(a)(1), based on a totality of the circumstances, the Court finds the brief detention reasonable and lawful.

II. Custodial Interrogation

The Government lastly argues Defendant was not in custody for *Miranda* purposes when he made the challenged statements. An interrogation is custodial when "under the totality of the circumstances, a reasonable man in [Defendant's] position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave." *United States v. Jayyousi*, 657 F.3d 1085, 1109 (11th Cir. 2011) (citation omitted); *see also United States v. Gomes*, 279 F. App'x 861, 868 (11th Cir. 2008) ("The court must . . . determine whether the suspect was subjected to a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'").[4] The test is objective, and "the reasonable person from whose perspective 'custody' is defined is a reasonable innocent person." *Jayyousi*, 657 F.3d at 1109 (citation omitted). Any uncommunicated intention of the deputies or Vadasz to arrest Defendant is thus irrelevant. *See Yarborough v. Alvarado*, 541 U.S. 652, 662-63 (2004).

---

[4] In this way, custody under *Miranda* is distinct from an investigatory stop: "[A] seizure does not necessarily constitute custody for *Miranda* purposes. The standards are different. The Fourth Amendment seizure analysis uses the 'free to leave' test: a person is 'seized' when 'a reasonable person would [not] feel free to terminate the encounter' with the police. By contrast, a person is in 'custody' for *Miranda* purposes only when there is a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Street*, 472 F.3d 1298, 1309-10 (11th Cir. 2006) (citations omitted).

The facts suggesting custody are few: the deputies were armed and dressed in their uniforms; the deputies woke Defendant and removed a blanket from his body; and defendant was not dressed to exit the residence.[5] On the other hand, the event occurred inside Defendant's apparent residence. *See Gomes*, 279 F. App'x at 868 (citation and quotation marks omitted) ("We have acknowledged that courts are *much* less *likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home." (emphasis in original)). Secondly, at the beginning of the encounter there were only two deputies inside the residence, and Defendant was unaware of the third deputy behind the house. What is more, Defendant was not isolated from other individuals such as the man who provided consent or the older man who later entered the living room. No weapons were drawn, and Vadasz testified Defendant was not handcuffed when he entered. In fact, the front door was still open.

As for the questioning itself, initially the deputies merely told Defendant to "stand by" as they waited for another agency to arrive. Once Vadasz arrived a few minutes later, the conversation between him and Defendant took less than a minute. *See, e.g., Muehler v. Mena*, 544 U.S. 93, 100-101 (2005) (noting that brief immigration questions did not extend seizure). It did not seem extraordinary or coercive, and there is no testimony that

---

[5] Deputies discovered Defendant on the couch, yet he was apparently seated in a chair by the door when Vadasz entered minutes later. Dkt. 63 at 57. The record is not clear what precisely happened. The ability to relocate would suggest a lack of custody. Even if the deputies directed him to move, however, this fact is insufficient to turn the encounter into a custodial interrogation.

11

any officer used a forceful tone or raised voice. No incriminating evidence was presented to Defendant.

In sum, the Government had consent to enter the residence and, whether analyzed as a *Terry* investigatory stop or an interrogation under 8 U.S.C. § 1357(a)(1), reasonable suspicion to detain Defendant briefly. Furthermore, prior to Vadasz handcuffing Defendant, there was no custodial interrogation to trigger *Miranda* protections. Suppression of the statements in the residence is therefore unwarranted.

Accordingly, the Government's objection to the report and recommendation is GRANTED. Dkt. 85. Defendant's motion to suppress the statements at the residence is DENIED, and the motion to suppress the statements made during booking is GRANTED. Dkt. 32.

**DONE AND ORDERED** at Tampa, Florida, on May 8, 2019.

/s/ *William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
All counsel of record